CLAY H. BROCK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DAN S. BROCK AND ANNIE B. BROCK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELLWOOD T. PFAU, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 37737, 37753, 37796. Filed May 13, 1954.

*Vincent F. Kilborn, Esq.*, for the petitioners.

*G. Goodwin Sweatt, Esq.*, and *J. Frost Walker, Esq.*, for the respondent.

### OPINION.

RAUM, *Judge:* 1. The principal question presented is whether petitioner Clay Brock is taxable on all of the income from transactions carried on through the medium of certain commodities and securities trading accounts which were opened in the names of some of his relatives. The situation may be summarized briefly as follows:

Brock was an experienced trader and had developed certain theories concerning the course the market would follow in the event of a World War. After the commencement of the Second World War, he entered into an arrangement with some of his relatives whereby commodities and securities trading accounts were opened, in the names of his relatives, with a brokerage firm. He made the initial deposits into such accounts to be used for trading purposes, and from time to time thereafter made additional deposits. As between the broker and the relatives in whose names the accounts were opened, the "owners" of the accounts were the various relatives. According to the arrangements between Brock and the relatives, he was given revocable powers of attorney which granted him complete control to buy and sell for the accounts, but no power to withdraw account funds.[1] The amounts deposited by Brock were neither gifts nor loans to his relatives, in whole or in part. It was agreed between Brock and the relatives that he would bear all losses with respect to such deposits, that gains were to be divided equally between them,[2] but that, prior to any division of profits, withdrawals from the accounts were to be applied first to reimburse Brock for the deposits that he had made in the account involved. The accounts were operated by Brock, and withdrawals from the accounts were in fact distributed in accordance with the understanding between Brock and his relatives.

We do not accept the Government's contention that these arrangements constituted a mere sham. However, it has long been estab-

---

[1] The power of attorney given him by Thomas E. Bruister was a general power of attorney and according to its terms Brock was also empowered to withdraw account funds.

[2] This agreement was modified to give Brock 60 per cent of the profits earned during the year 1946 in the case of some of the accounts.

lished that income is taxed to him who earns it, either through his labor or capital, and that an agreement whereby a person's income shall belong to another, even though valid as between the parties, is ineffective to shift the tax consequences attached to the earning of that income from one person to another. *Lucas* v. *Earl*, 281 U. S. 111. There is no disagreement between the parties concerning the correctness of the general rule. Each party has cited a number of cases endeavoring to show how the rule has been applied in various factual situations and its applicability to the instant case. Each of the cases cited, however, applied the principle to its own facts and this case must be decided in a similar manner.

The income involved herein was earned from transactions in the commodities and securities markets made through accounts, carried in the names of Brock's relatives. Whatever "labor" that was involved in the earning of such income consisted almost entirely of Brock's utilizing his experience on the market in determining what transactions to initiate or terminate.[3] The "capital" used for trading purposes was furnished by Brock through what were, in form, deposits in or "advances" to the accounts. If, in fact, such deposits were in whole or in part bona fide loans to the persons in whose names the accounts stood, some of the "capital" was furnished by them. However, these deposits were not in fact loans to the account owners, but remained in substance the property of Brock, so that the capital, at least to that extent, was furnished by him. These deposits were repayable only from account funds and not from the personal funds of the account owner; and if the deposits were lost due to entering into unprofitable transactions, such losses were borne entirely by Brock. In these circumstances, it seems clear that the capital represented by Brock's deposits, as well as the labor, was furnished solely by him, and income earned therefrom is taxable to him.

The situation changed, however, after profits had been earned which produced a balance that was greater than the amounts of Brock's deposits in the particular account. For, at that point, according to the agreement between Brock and the account owner, the profits were to belong equally to Brock and the account owner. If the arrangement were terminated at that time the account owner was entitled to take 50 per cent of such profits as his own. If such profits were allowed to remain in the account for further investment, a portion of the capital was, then, furnished by the account owner, and Brock's services were thereafter performed, in part, as the owner's agent. To the extent that such profits remained undivided and were reinvested, any

---

[3] The evidence that Brock consulted his relatives in connection with his trading was pitifully weak, and, with but a single exception, we cannot accept the position that the acumen, skill, or judgment of anyone other than Brock played any substantial part in executing any of the trades involved. That single exception related to the separate account that was opened and managed by Lofton Brock in Knoxville in 1947.

subsequent profits or losses with respect thereto are chargeable to both Brock and his coventurer in accordance with their agreement.[4]

2. The additions for fraud asserted by the Commissioner are based on the theory that the arrangements entered into by Brock and his relatives were a sham. We have heard the witnesses and have carefully studied the record, and we are satisfied that fraud has not been proved.

3. A minor issue relating to depreciation remains to be discussed. The petitioner Clay Brock had a number of coin-operated machines on which he had been using a composite rate of depreciation. The Commissioner contends here that the machines should have been fully depreciated over a period of two years and made adjustments in the determination of the deficiencies on that basis.

From about 1936 or 1937 the petitioner had been using the composite rate and depreciating the property over a period of 6 years. He introduced evidence to the effect that such method was a reasonable one. The composite rate method has been approved by the Treasury Department. See United States Treasury Department Bulletin "F" (revised January 1942), p. 6. We agree that the petitioner's method was proper, and that the rate employed was reasonable.[5]

*Decisions will be entered under Rule 50.*

[4] The amounts of deposits made by Brock into the various accounts, the profits and losses of the accounts, and the withdrawals therefrom have all been stipulated and incorporated by reference as part of our findings of fact, which can be used by the parties as a basis for the computation to be submitted under Rule 50.

[5] It was conceded by petitioner's counsel at the hearing that no depreciation should be allowed on such machines for the year 1947. This concession may be taken into account in making the Rule 50 computation.